STATE of Missouri, Respondent,

v.

Robert Wesley KNIGHTON, Appellant.

No. 9705.

Missouri Court of Appeals,
Springfield District.

Jan. 24, 1975.

John C. Danforth, Atty. Gen., Philip M. Koppe, Asst. Atty. Gen., Jefferson City, for respondent.

John B. Newberry, Springfield, for appellant.

Before BILLINGS, C. J., and TITUS and FLANIGAN, JJ.

BILLINGS, Chief Judge.

A jury found defendant Robert Wesley Knighton guilty of three counts of kidnapping (§ 559.240, RSMo 1969, V.A.M.S.). The court, having determined that the Second Offender Act (§ 556.280, RSMo 1969, V.A.M.S.) was applicable by reason of the defendant's 1968 robbery conviction, assessed punishment of three consecutive ten-year sentences. We affirm.

In this appeal the defendant has challenged the sufficiency of the evidence to support the three convictions and, additionally, alleges prosecutorial misconduct and error in the admission of certain evidence. Since the latter assignments are interrelated to the facts and inferences relied upon by the state to support the convictions, it is necessary that we detail the facts giving rise to the defendant's multiple count prosecution for kidnapping. In so doing, we adhere to the well-established principle of judicial review of criminal convictions that we consider the evidence and inferences most favorable to the guilty verdicts and disregard any evidence and inferences to the contrary. State v. Strong, 484 S.W.2d 657 (Mo.1972); State v. Jones, 518 S.W.2d 304 (Mo.App.1975).

During the afternoon of September 15, 1973, Claude Day and his son Coffier were at their Springfield residence when the defendant came to see Coffier Day. A short time later the elder Day was wounded in the neck and his son was mortally wounded by pistol shots fired by the defendant.[1] Immediately following the shootings the defendant left the Day house afoot and went to the Charles Jarrett residence some two blocks away. He attempted to drive

---

1. The transcript reveals that during a conference between the attorneys and the court, out of the hearing of the jury, the defendant's attorneys advised the court that the defendant had pleaded guilty to the crime of manslaughter for the death of Coffier Day.

away from the vicinity in an older model automobile that was parked in the front yard of the Jarrett home and bore a "for sale" sign, but he was unable to start the vehicle since the battery had been removed.

The Jarrett family, consisting of Mr. Jarrett, Mrs. Jarrett and six-year-old Traci, was away from their home attending a neighborhood sale at the time of the shootings at the Day residence. About four o'clock the father and daughter returned home in Mr. Jarrett's pick-up truck and entered the house. As they neared a rear bedroom the defendant emerged from that room brandishing a pistol. The defendant warned Mr. Jarrett to not get excited, that "I've killed four people in the last two weeks," and "I just killed two."

Mrs. Jarrett arrived home in the family automobile a short time later and entered the house. She too was confronted by the gun-wielding defendant. The defendant told the Jarretts he "needed to get away and if [the Jarretts] tried to run or do anything he would kill them and [Traci] would be the first to be killed." The defendant placed his hand on the child's head while pointing the pistol at the back of her head and asked her parents if they "had ever seen what one of these will do?" He told the Jarretts: "I can get any of you faster than you can run."

The defendant ordered the radio and television turned on so he could hear the newscasts of the Day shootings. When it was initially reported that one of the Days had died and one had not, the defendant stated he would have to go back and get the other one. However, a later news report identified the dead man as Coffier Day, and with this information the defendant then told the Jarretts that the one he "wanted" had died; that he had wanted to kill [Coffier Day] since 1968 because Coffier Day "had told on him or got him set up when [defendant] went to the penitentiary." The defendant also admonished the Jarretts not to address him as "sir" because that term reminded him of the peni-

tentiary. The defendant also mentioned that he had recently committed a robbery in the neighborhood.

At the defendant's direction and at gunpoint Mrs. Jarrett telephoned her employer to inform him she could not report to work at five o'clock. When several prospective purchasers of the old model car came to the Jarrett door to make inquiry about the vehicle, the defendant kept his weapon trained on Mr. Jarrett. By telephone the defendant talked to a person he called "Francis" and sought directions to the latter's place, advising "Francis" that he had three hostages and wanted to come out "there."

The defendant continued to hold the Jarrett family at gunpoint at their home until sometime between 6:00 and 6:30 p. m. He put on some of Mr. Jarrett's clothing and a short wig belonging to Mrs. Jarrett and then forced Mr. Jarrett to take a quantity of pills he described as ones he took to "keep from killing people." The medication caused Mr. Jarrett to become "groggy."

The defendant and the Jarrett family left the home in the Jarrett automobile with the defendant driving. The child was in the front seat between the defendant and her mother, and pursuant to the defendant's directions Mr. Jarrett lay down on the back seat. The defendant's pistol was stuck in his belt.

Before the car left Springfield the defendant stopped at a service station for gas, after first ordering Mr. Jarrett to "get up . . . because [defendant] didn't want anybody to see [Mr. Jarrett] lying down." At this stop the defendant ordered Mr. Jarrett to go to a nearby liquor store and purchase some beer. Mr. Jarrett did so while his wife and daughter remained in the car with the defendant. Mr. Jarrett made no attempt to notify the authorities because of the defendant's statements that if the police came "he would have a shoot-out and Traci would be the first one to go if anything went wrong."

The defendant drove the car to near Marshfield, Missouri, where he stopped at another service station for the purpose of getting further instructions from "Francis" on the route to "Francis'" place. On this occasion the defendant had Mr. Jarrett remain in the car while he took Mrs. Jarrett and Traci with him to the telephone booth.

A few miles further down the highway the defendant drove the car onto a dirt road which ultimately led to a farmhouse where "Francis" was located. As the car passed an oncoming truck the defendant asked the Jarretts if "it would excite Traci too much if [defendant] killed this guy [the truck driver]." Another time the defendant exclaimed: "I'd like to just stop and shoot a bunch of people." When the car arrived at the farmhouse the defendant told "Francis" that Mrs. Jarrett was "the girl I dated for six years before I went to the penitentiary," and that she had married while defendant was in the penitentiary—all of which was untrue.

At the farmhouse the defendant, "Francis" and the Jarrett family were joined by a man called "Big J.". The progress of the police search for the defendant was followed on a radio that scans police frequencies. The defendant, "Francis", and "Big J." engaged in conversations concerning the Day shootings, weapons, money, and what was going to be done with the Jarretts. After several hours, and after the defendant obtained a shotgun and another pistol, the defendant had the Jarrett family get into the automobile and drove to a cafe located at Rolla, Missouri. The child was left asleep in the back seat of the car, and the defendant and Mr. and Mrs. Jarrett entered the eating establishment. Mrs. Jarrett tipped off a waitress as to her family's

plight and asked for help when she made a proposed assault on the defendant with a steak knife. The assault followed, and with the assistance of others the defendant was disarmed and held until police arrived.

Both Mr. and Mrs. Jarrett testified that they never at any time voluntarily accompanied the defendant, but that going with the defendant was coerced and induced by the defendant's threats upon their lives and the life of their daughter.

The defendant offered no evidence.

The statute under which the defendant was prosecuted is § 559.240, RSMo 1969. Paragraph 1 provides: "If any person shall, willfully and without lawful authority, forcibly seize, confine, inveigle, decoy or kidnap any person, with intent to cause such person to be sent or taken out of this state, or to be secretly confined within the same against his will, or shall forcibly carry or send such person out of this state against his will, he shall, upon conviction, be punished by imprisonment in the penitentiary not exceeding ten years." [2]

In support of his contention that the state's evidence was insufficient to support the guilty verdicts, and therefore the trial court erred in overruling his motion for judgment of acquittal at the close of the state's case, the defendant advances two arguments. First, he says, Mr. Jarrett was not forcibly seized and kidnapped because he volunteered and consented to accompany his wife and daughter with the defendant. Secondly, he urges that the evidence failed to show the Jarretts were secretly confined within the state because they were taken to two service stations and a cafe.

■ The defendant's contention in regard to Mr. Jarrett ignores the positive

---

2. At the common law kidnapping was a misdemeanor committed by the unlawful and forcible abduction or stealing away of a person against his will from his own country and sending him to another. Furlong v. German-American Press Ass'n., 189 S.W. 385 (Mo. banc 1916). Thus, at common law, kidnapping was false imprisonment aggravated by conveying the victim out of the country.

Perkins, Criminal Law and Procedure, 100–101 (4th ed. 1972). Professor Perkins notes that the statutes go beyond this, with the most common addition being false imprisonment with the intent to cause the victim to be imprisoned secretly within the state. Id. at 101. § 559.240, supra, is this type statute. State v. Higgs, 325 Mo. 704, 29 S.W.2d 74 (1930).

testimony of Mr. Jarrett that he did not voluntarily consent to accompany the defendant. A consent induced by fear of personal violence is no consent. State v. Schuster, 282 S.W.2d 553 (Mo.1955). And here, the defendant had threatened the lives of Mr. Jarrett, Mrs. Jarrett and Traci. He advised "Francis" that he had "three hostages". The defendant's subsequent equivocation as to which members of the family he would take with him in his flight does not alter the fact of forcible seizure [3] of Mr. Jarrett or his understandable fears for the lives and safety of his wife and daughter. We also observe that in the instructions the state assumed an undue burden in requiring the jury to find that the defendant "forcibly seized *and* kidnapped" the Jarretts inasmuch as the statutory language reads "forcibly seize . . . *or* kidnap . . . " Defendant's point is without merit.

We likewise find no merit in the defendant's contention regarding lack of proof that the Jarrett family was secretly confined with the requisite intent. "Secret confinement, within the meaning of § 559.-240, does not require proof of total concealment and complete isolation whereby the victim is rendered invisible to the entire world. *It is sufficient to show that the person kidnapped has been effectively confined against his will in such a manner that he is prevented from communicating his situation to others and accused's intention to keep the victim's predicament secret is made manifest."* State v. Weir, 506 S. W.2d 437, 440 (Mo.1974) (our emphasis). In *Weir* the confinement to and movement from place to place in an automobile in downtown Kansas City was held to constitute "secret confinement."

The facts here amply demonstrate the defendant's intent to secretly confine the Jarretts. The defendant forced Mrs. Jarrett, by pointing his pistol between her eyes, to call her employer and cancel her employment for the evening. He stood by the door aiming his weapon at Mr. Jarrett when would-be purchasers of the old automobile came to make inquiries. He disguised himself in Mr. Jarrett's clothing and Mrs. Jarrett's wig. He first had Mr. Jarrett lie on the back seat, but then he had him get up before driving into the service station. During all the time the parties were in the automobile the defendant was armed, and in addition to having informed the Jarrett's of the number of people he had recently killed, he had stated that he had to get away and if the Jarretts attempted to run or the police approached them he would kill all of them, the child first. On any occasion when one of the Jarretts was physically separated from the defendant he was holding one or more of them hostages. The jury could also consider defendant's motive to evade the law and make his escape as bearing on his intent to secretly confine the Jarrett family.

We think it is clear that under the evidence the jury could find, from the defendant's words and conduct, that following his forcible seizure of the Jarretts he had the required statutory specific intent to confine them in such a manner that they were prevented from communicating their situation to others. The jury could find the Jarretts were in fact "secretly confined" by the defendant during the nearly two hours they were his hostages at the Jarrett residence; during the several hours they were his prisoners at the farmhouse; and, during the time they were captives in the car and being moved from place to place.

We now consider the defendant's assignments that (a) it was error for the prosecuting attorney, both in opening statement and argument, to refer to the shootings of Mr. Day and his son and (b) admission of evidence concerning these shootings was error. The defendant contends these alleged trial errors do violence to the estab-

---

3. "Equivalent to the use of actual force or violence are appeals to the fears of the individual, such as by threats to kill or similar threats . . . ." 51 C.J.S. Kidnapping § 1(4), at 498 (1967). Also 1 Am.Jur.2d Abduction and Kidnapping § 13, at 168 (1962).

lished rule that proof of the commission of separate and distinct crimes, other than that charged in the information, is not admissible unless such proof has some legitimate tendency to directly establish the defendant's guilt of the charge for which he is on trial. State v. McDaris, 463 S.W.2d 809 (Mo.1971); State v. Holbert, 416 S. W.2d 129 (Mo.1967); State v. Reese, 364 Mo. 1221, 274 S.W.2d 304 (banc 1954).

■ The rule referred to is not without equally recognized exceptions. Generally speaking, evidence of other crimes is competent to prove the specific crimes charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; (5) the identity of the person charged with the commission of the crime on trial. State v. Reese, supra. In his brief the defendant has laboriously considered each of the exceptions, as well as the res gestae exception [State v. Cox, 508 S.W.2d 716 (Mo. App.1974)], and concluded none of the exceptions are applicable to the case at hand. Conversely, the state just as earnestly contends exceptions to show motive (1) and common plan or scheme (4), supra, apply to the instant facts.

■ The test of whether evidence of a separate and distinct crime has a legitimate tendency, as enumerated above, to establish an accused's guilt in the matter charged " ' . . . [I]s its logical relevancy to the particular excepted purpose or purposes for which it is sought to be introduced. If it is logically pertinent in that it reasonably tends to prove a material fact in issue, it is not to be rejected merely because it incidentally proves the defendant guilty of another crime. . . .' " State v. Reese, supra, 274 S.W.2d at 307. So tested, it is patent that the shootings at the Day residence gave the defendant a motive—to avoid capture and criminal sanctions for these shootings—to commit the crimes for which he was charged. State v. Lewis, 181 Mo. 235, 79 S.W. 671 (1904) (motive

for murder of detective was to avoid arrest and punishment for burglary; evidence of burglary four weeks before killing admitted). Although motive is not an element of the crimes defendant was charged with, that is true of all crimes except to the extent provided by statute. State v. Henderson, 301 S.W.2d 813 (Mo.1957). However, motive "in turn may serve as evidence of the identity of the doer of the crime on charge, or of deliberations, malice, or a specific intent constituting an element of the crime." McCormick, Evidence § 190, at 450–451 (2d ed.1972); see generally, I Wigmore, Evidence §§ 117–119 (3rd ed. 1940).

Here, the defendant's motive clearly bears on the question of whether he was the perpetrator of the criminal acts as charged and also on the issue of whether he had the requisite specific intent for those crimes. He was charged with *three* kidnappings and we are of the opinion the state was properly permitted to show his motive therefor. By kidnapping each of the Jarretts, no potential informers were left behind, and a maximum of hostages were taken. The shootings of Mr. Day and his son established the defendant's motive for the events which followed and culminated in the kidnappings. Otherwise, it would seem incongruous for a person to break into the home of a stranger and kidnap three persons whom he had never met and for no apparent reason.

We also hold that under the facts as related herein, the evidence of the shootings was also admissible to show a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tended to establish the other. The shootings and kidnappings were inextricably related, and were connected both in point of time and circumstances. The shootings, a short distance away and only minutes earlier, were not incidents separated and isolated from the forcible seizure and secret confinement of the Jarretts. The kidnappings were a part of a continuous transaction which initiated with the shootings. State v. Garrison, 342

Mo. 453, 116 S.W.2d 23 (1938). Also see State v. Shumate, 478 S.W.2d 328 (Mo. 1972) (holding separate acts admissible as part of the res gestae).

The defendant complains of the prosecutor's references in his opening statement and argument to the shootings of the two Day men. "If the mentioned evidence was properly admissible, as we think it was, there was of course no error in permitting the State to review it before the jury, as being evidence which the State expected to prove, or in reviewing it in argument before the jury after the evidence was in the record." State v. Williams, 369 S.W.2d 408, 417 (Mo.banc 1963); see State v. King, 375 S.W.2d 34, 39 (Mo.1964).

■ However, the defendant argues "that even if incidental admission of evidence of the shootings and comment thereon was permissible, the extensive use of the shootings in both opening statement and closing argument as well as detailed testimony thereon was grossly improper, unwarranted, and prejudicial." We first observe that the defendant made no objection to the evidence which was admitted to show the Day shootings and made no mention thereof in his motion for new trial. Under these circumstances the question of the quantum of evidence to show the Day shootings is not before us. State v. Balle, 442 S.W.2d 35, 40 (Mo.1969); State v. Persell, 506 S.W.2d 49, 50 (Mo. App.1974). While some of the evidence presented may have unnecessarily delved into details of the shootings (a point we do not decide), this court need not "sift through a record and determine what is admissible and what is not." State v. Foster, 501 S.W.2d 33, 36 (Mo.1973). Likewise, no objection to the prosecutor's closing argument with reference to the shootings was preserved in the motion for new trial. See State v. King, supra, 375 S.W.2d at 39.

Defendant's final claim of error is in prosecutorial comments concerning defendant's prior criminal record, and further, in the prosecutor's elicitation from both Mr. and Mrs. Jarrett of defendant's statements that he had been in the penitentiary.

■ The Jarretts were permitted, over objection, to testify as to the defendant's statements that he did not wish to be called "sir" since "it reminded him of the penitentiary", and also that he shot the younger Mr. Day because "he had told on him or got him set up when he went to the penitentiary." The trial judge admitted these statements into evidence, not to show that the defendant had in fact been in the penitentiary, but as bearing upon the nature of defendant's threats to the Jarretts.

Defendant's statements that he had been in the penitentiary were calculated to create in the Jarretts' minds the belief that they were dealing with an ex-convict, and that his threats were not to be taken lightly. The communication by defendant to the Jarretts was relevant to the issue of whether, as contended by defendant at trial and on appeal, any or all of the Jarretts consented, without coercion, to accompany defendant. See 1 Am.Jur.2d Abduction and Kidnapping § 15, at 170 (1962). Furthermore, defendant's statement that he had shot the younger Day for revenge, helped to explain why the Jarretts did not attempt to escape before reaching the Rolla restaurant, and thus risk incurring defendant's wrath. The challenged evidence was thus admissible regardless of whether or not defendant had in fact been in the penitentiary.

Defendant's contention that the prosecutor's argument improperly referred to the defendant's criminal record is based upon two statements contained in that argument.

■ The first statement now the subject of complaint was made during the prosecutor's summation of the first part of his closing argument: "The law and the facts are here, and that's what I'm asking you to do, deliberate and reach your verdict and convict [defendant] on each count. We're not talking about a kid here

that you might want to go easy on, he's a cold-blooded, *hardened criminal*, and for that reason I'm asking you to convict him, and convict him on all three counts, and I say that without reservation, without the same reservation he had when he kidnapped these three people. Thank you." Defendant did not object to this statement and did not complain of this comment in his motion for new trial; consequently, nothing has been preserved for review. State v. Berns, 502 S.W.2d 364, 370 (Mo.1973); State v. Carter, 478 S.W.2d 358, 361 (Mo. 1972). Additionally, the reference to defendant as a "hardened criminal" had a clear connotation in light of the evidence, that defendant was a person who relished the idea of threatening the lives of other people. The statement, taken in context, does not remotely refer to defendant's criminal record.

The second complained-of statement occurred at the conclusion of the prosecutor's rebuttal argument. ". . . Ladies and Gentlemen, we're not talking about a first offender here and under our system of criminal law—" This statement was interrupted (and never finished) by defendant's unsuccessful motion for mistrial.

■ The transcript reflects that this statement was made in response to the argument of defense counsel to the effect that a conviction on any of the three counts of kidnapping would ruin the defendant's life, prevent him from ever obtaining employment and cause him to forfeit his civil rights. This argument was patently improper since it invited the jury to infer that defendant was a first offender, a fact known by defense counsel to be false.[4] The comment of the prosecutor, considered in context, was provoked by and was made in retaliation for the argument of defense counsel.

■ It is settled law that "an attorney for defendant cannot provoke a reply to his own improper argument, and then claim error." State v. Tiedt, 357 Mo. 115, 206 S.W.2d 524, 527 (banc 1947). "Where the argument complained of on appeal is retaliatory in nature and invited by remarks and suggestions of appellant's counsel an assignment of error thereon will not be sustained." State v. Tiedt, 360 Mo. 594, 229 S.W.2d 582, 588 (banc 1950). Further, the prosecutor "can go further by way of retaliation, in answering arguments of the defendant's counsel, than he would be authorized to do in the first instance." State v. Tiedt, supra 229 S.W.2d at 588. The trial court has considerable discretion in permitting the use of retaliatory arguments and in ruling a motion for mistrial based thereon. State v. Smith, 431 S.W.2d 74, 85 (Mo.1968); State v. Cusumano, 372 S.W. 2d 860, 866 (Mo.1963).

The trial judge denied the instant point, in overruling both a motion for mistrial and a motion for new trial, after due consideration, and we must rely to a considerable extent on the judgment of the trial court. State v. Cusumano, supra. Before ruling against defendant's motion for new trial, the learned trial judge reviewed the transcript of the closing argument and concluded that the prosecutor's statement was brought out "in a somewhat retaliatory way," and "overall it couldn't be considered as prejudicial." The trial judge noted that the jury was instructed in writing "to the effect that nothing in an attorney's argument is to be taken as evidence." Further, said the court, "I believe that the court's not instructing the jury to disregard it was overall the proper course for the court to take. I believe that an instruction by the court would have to be somewhat complicated and would merely have tended to focus the jury's attention on this point . . . and the court did have reason to think that the defense did not want any instruction given to the jury on this point." We agree with the trial

---

4. Not only was this case tried under the Second Offender Act, but the defense counsel had prosecuted the earlier (1968) conviction and had represented the defendant on his earlier manslaughter guilty plea for killing Coffier Day.

court that the statement made by the prosecutor, although not recommended, was retaliatory in nature and did not prejudice defendant's right to a fair trial. See cases cited in 9A Mo.Digest, Criminal Law

Defendant cites several cases in which the prosecutor, without justification, repeatedly made prejudicial comments during his argument. State v. Nickens, 403 S.W. 2d 582 (Mo.banc 1966); State v. Mobley, 369 S.W.2d 576 (Mo.1963); State v. Tiedt, supra, 206 S.W.2d at 524. These cases involve extreme circumstances of prosecutorial abuse not comparable to the facts in the present case.

The amended information upon which the defendant was put to trial is sufficient. The verdicts are in proper form and responsive to the evidence adduced. Allocution was afforded. The sentences are within the range permitted by law, and pursuant to the authority granted him, the trial judge ordered the sentences to be served consecutively following the defendant's sentence for manslaughter.

The judgment is affirmed.

All concur.